## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HUGUES GERVAT, derivatively on behalf of TYSON FOODS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> NOEL WHITE, DEAN BANKS, STEWART GLENDINNING, JOHN H. TYSON, LES R. BALEDGE, GAURDIE E. BANISTER, MIKE BEEBE, DAVID J. BRONCZEK, MIKEL A. DURHAM, JONATHAN D. MARINER, KEVIN M. MCNAMARA, CHERYL S. MILLER, JEFFREY K. SCHOMBURGER, ROBERT THURBER, and BARBARA TYSON, <br><br> Defendants, <br><br> and <br><br> TYSON FOODS, INC., <br><br> Nominal Defendant. | Case No.: 1:21-cv-730 <br><br><br><br> **DEMAND FOR JURY TRIAL** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiff Hugues Gervat ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and

on behalf of Nominal Defendant Tyson Foods, Inc. ("Tyson" or the "Company"), files this Verified

Shareholder Derivative Complaint against Noel White, Dean Banks, Stewart Glendinning, John

H. Tyson, Les R. Baledge, Gaurdie E. Banister, Mike Beebe, David J. Bronczek, Mikel A. Durham,

Jonathan D. Mariner, Kevin M. McNamara, Cheryl S. Miller, Jeffrey K. Schomburger, Robert

Thurber, and Barbara Tyson (collectively, the "Individual Defendants," and together with Tyson,

the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Tyson, unjust

enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tyson, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Tyson's directors and officers from March 13, 2020 through the present (the "Relevant Period").

2. Tyson is purportedly one of the world's largest food companies and one of the largest providers of protein in the meat packing industry. The Company was founded in 1935 by John W. Tyson and has been led by three generations of the Tyson family since then. The Company employs more than 120,000 people in facilities across the United States.

3. Tyson has a broad range of protein products and brands. The Company has a vertically integrated chicken production process, live cattle and hog processing, and frozen and refrigerated food products.

4. Since December 2019, the world has been engulfed in a pandemic brought on by the rapid spread of COVID-19, a disease caused by a recently discovered coronavirus. This

pandemic is one of the most serious public health crises in recent history, and at the time of the filing of this action, over 107 million cases of the virus have been reported worldwide, with the death toll approaching 2.4 million.

5.    COVID-19 can lead to a range of responses, from an asymptomatic response to flu-like symptoms (including difficult breathing, fatigue, headache, new loss of taste or smell, sore throat, congestion, and nausea), to hospitalization and death. In response, daily life in the United States has changed, and the Center for Disease Control ("CDC") has recommended businesses and individuals take protective measures such as social distancing of at least six feet indoors and wearing an effective face mask.

6.    Starting around March 2020, the Company assured investors that the health and safety of its "team members" was its "top priority," and that Tyson was monitoring and responding to the COVID-19 outbreak, including by forming a task force and taking safety measures and precautions.

7.    In the meantime, Tyson lobbied the government to deem meatpacking an "essential" business, so that its facilities could remain open, and ran advertisements in major newspapers warning Americans that the food supply chain was at risk—while exporting the most pork to China in years.

8.    However, Tyson failed to maintain even the most basic preventive measures and did not tell workers when their colleagues tested positive for COVID-19. Instead, during the Relevant Period, the Company exposed its employees' health and lives and took minimal precautions to prevent the outbreak of COVID-19 at its facilities, including by: (i) allowing workers to wear unprotective face coverings such as bandanas and sleep masks; (ii) failing to implement social distancing, despite enforcing plastic sheet dividers between elbow-to-elbow

workers, which was widely known to be ineffective; (iii) misleading employees about the severity of the health risks; (iv) disincentivized from taking sick leave; and (v) failing to prevent overcrowding in employee bathroom facilities (the "COVID-19 Working Condition Misconduct"). As a result, Tyson suffered from massive viral outbreaks at its plants, forcing the Company to temporarily close certain facilities—negatively effecting not only the health of its workers, but also its production. According to later reports on the Company, by the end of the year in 2020, Tyson had triple the amount of COVID-19 cases and twice as many related deaths compared to other companies operating in the meat packing industry, making it the Company with the highest cases in the industry.

9.     On December 15, 2020, the New York City Comptroller Scott M. Stringer ("Comptroller Stringer") wrote a letter urging the SEC to investigate Tyson's recent annual report alleging that it contained materially false and misleading information.[1] In reaction to this news, the price of Tyson shares plummeted by 2.5%, or $1.78, from closing at $ 69.78 per share on December 14, 2020, to close at $68.25 per share on December 15, 2020.

10.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by engaging in and/or causing Tyson to engage in the COVID-19 Working Condition Misconduct. The Individual Defendants were well aware of the severity posed by the global pandemic and knew or should have known that the Company's actual policies and procedures were out of line with the Company's purported representations. Despite this, throughout the Relevant Period, the Individual Defendants consistently represented to the investing public that the Company was implementing sufficient measures to protect its employees and, in turn, production.

---

[1] Comptroller Stringer's letter is attached hereto as Exhibit A ("Ex. A").

11.     Consequently, employees that contracted the virus and families of workers who lost their lives to COVID-19 brought lawsuits against the Company. Moreover, Tyson is one of three major meat companies being investigated by the U.S. Congress.

12.     In further breach of their fiduciary duties during the Relevant Period, the Individual Defendants personally made and/or caused the Company to make a series of materially false and misleading statements regarding the Company's business, operations, prospects, and legal compliance. Specifically, during the Relevant Period the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia,* that: (1) Tyson was engaging in the COVID-19 Working Condition Misconduct, exposing its workers and surrounding communities to the spread of COIVD-19; (2) the Company knew or should have known that COVID-19 was rapidly spreading across the globe; (3) consequently, Tyson's production suffered, resulting in financial harm to the Company; (4) the Company was exposed to an increased risk for litigation and regulatory scrutiny; and (5) the Company failed to maintain internal controls. As a result of the foregoing, Tyson's public statements were materially false and misleading during the Relevant Period.

13.     The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14.     During the Relevant Period, the Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

15.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected Tyson to numerous lawsuits including actions brought by or on behalf of Tyson workers

that were exposed to COVID-19 due to the COVID-19 Working Condition Misconduct and a a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of New York pending against Tyson, its President and Chief Executive Officer ("CEO"), its previous CEO, and its Chief Financial Officer ("CFO") (the "Securities Class Action"). The Company has also been subjected to increased regulatory scrutiny and investigations. The Individual Defendants' breaches of fiduciary duty and other misconduct have additionally resulted in the need for Tyson to undertake internal investigations and losses due to the Individual Defendants having been improperly over-compensated by the Company, and will cost the Company going forward many millions of dollars.

16.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action, and for their not being disinterested and/or independent directors, a majority of the Tyson Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. §78u-4(f).

19.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

23.     Plaintiff is a current shareholder of Tyson. Plaintiff has continuously held Tyson common stock since before the beginning of the Relevant Period.

**Nominal Defendant Tyson**

24.     Tyson is a Delaware corporation with its principal executive offices located at 2200 West Don Tyson Parkway, Springdale, Arkansas. Tyson's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "TSN."

**Defendant White**

25.     Defendant Noel White ("White") has served as the Company's Executive Vice Chairman of the Board since October 2020 and as a Company director since 2018. He also served as CEO and as President of the Company from September 2018 until October 2020 and December 2019, respectively.  Previously, he served as a Group President Fresh Meats and International and Chief Operations Officer for the Company since 2017, President of Poultry since 2013, and Senior Group Vice President of Fresh Meats since 2009. According to the Company's Schedule 14A filed with the SEC on December 23, 2020 (the "2020 Proxy Statement"), as of December 14, 2020,

Defendant White beneficially owned 359,508 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on December 14, 2020 was $69.78, Defendant White owned approximately $25.1 million worth of Tyson stock.

26.    For the fiscal year ended October 3, 2020 (the "2020 Fiscal Year"), Defendant White received $10,993,649 in compensation from the Company. This included $1,291,308 in salary, $5,390,122 in stock awards, $1,600,010 in option awards, $1,849,528 in non-equity incentive plan compensation, $147,952 in change in pension value and nonqualified deferred compensation earnings, and $714,729 in all other compensation.

27.    The Company's 2020 Proxy Statement stated the following about Defendant White:

> Noel White, 62, has served as Executive Vice Chairman of the Board since October 3, 2020, prior to which he served as Chief Executive Officer of the Company from September 2018 to October 3, 2020, and as President from September 2018 to December 2019. Mr. White has been a member of the Board since October 2018. Prior to his appointment as President and Chief Executive Officer, he served as a Group President Fresh Meats and International and Chief Operations Officer for the Company in 2017, prior to which he served as a President, Poultry since 2013 after serving as a Senior Group Vice President, Fresh Meats since 2009. The Board believes Mr. White's more than 35 years of experience in the food industry with the Company and IBP, inc. (which was acquired by the Company in 2001) and his successful tenure in senior leadership roles with the Company qualify him to serve on the Board.

### Defendant Banks

28.    Defendant Dean Banks ("Banks") has served as Tyson's President and CEO since October 3, 2020. He has also served as President since December 20, 2019 and has been a member of the Board since 2017. According to the 2020 Proxy Statement, as of December 14, 2020, Defendant Banks beneficially owned 57,781 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on December 14, 2020 was $69.78, Defendant Banks owned approximately $4 million worth of Tyson stock.

29.    For the 2020 Fiscal Year, Defendant Banks received $12,782,054 in compensation from the Company. This included $920,662 in salary, a $5,000,000 bonus, $3,587,873 in stock awards, $1,071,001 in option awards, $1,343,733 in non-equity incentive plan compensation, and $858,785 in all other compensation.

30.    The Company's 2020 Proxy Statement stated the following about Defendant Banks:

> Dean Banks, 47, has served as the Company's President and Chief Executive Officer since October 3, 2020, having previously assumed the role of President effective December 20, 2019 and he has been a member of the Board since 2017. Prior to joining the Company as President, Mr. Banks was a Project Lead and on the Leadership Team at X (formerly Google [x]), an Alphabet Inc. company, since 2016, prior to which he was a managing partner and interim CEO at SEED Ventures since 2015. He has also previously served in leadership and consulting roles with IntraCelluar Technologies, now Vergent Bioscience, where he remains a board member; Cleveland Clinic Innovations and the Ohio Orthopedic Commercialization Center; OrthoHelix (acquired by Tornier, Inc.); Connective Orthopaedics; Highland Capital Partners; Cytyc Corporation (acquired by Hologic); and Ethicon Endo-Surgery, a Johnson & Johnson company. Mr. Banks was the founding CEO and serves on the board of Vergent Bioscience, which develops molecular imaging probes for life science research and development. He formerly served on the board of Connective Orthopaedics and as Chairman of Stratifund, Inc, an online crowdfunding educational platform. The Board believes that his substantial experience as a recognized leader in the innovation and technology industries, together with his expertise in corporate and business development and venture capital investment, qualify him to serve on the Board.

### Defendant Glendinning

31.    Defendant Stewart Glendinning ("Glendinning") has served as the Executive Vice President and CFO of Tyson since February 2018, after serving as an Executive Vice President since December 2017. According to the 2020 Proxy Statement, as of December 14, 2020, Defendant Glendinning beneficially owned 121,051 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on December 14, 2020 was $69.78, Defendant Glendinning owned approximately $8.4 million worth of Tyson stock.

32.    For the 2020 Fiscal Year, Defendant Glendinning received $3,912,013 in compensation from the Company. This included $817,269 in salary, $1,600,193 in stock awards, $475,012 in option awards, $852,500 in non-equity incentive plan compensation, $15,175 in change in pension value and nonqualified deferred compensation earnings, and $151,864 in all other compensation.

33.    The Company's website stated the following about Defendant Glendinning:[2]

Stewart Glendinning is responsible for the worldwide finance and accounting functions for the largest U.S. food company and represents Tyson Foods on matters involving investors, banks, ratings agencies, auditors and other financial matters, as well as the company's procurement activities. He also leads corporate strategy, identifying organic growth and M&A opportunities.

A member of Tyson Foods' enterprise leadership team, Stewart reports to President & CEO Dean Banks.

Stewart joins Tyson Foods from Molson Coors Brewing Company, where he served as president and CEO of Molson Coors International. He began his career at Molson Coors in 2005 as chief financial officer for Molson Coors UK and subsequently held the positions of chief financial officer for Molson Coors Brewing, president and CEO of the UK Business, and President and CEO of Molson Coors Canada.

Before joining Molson Coors in 2005, Stewart worked with KPMG and then The Hackett Group, both professional services companies where he held various senior audit and consulting roles.

Stewart earned his bachelor's degree in accounting from the College of William and Mary and a law degree from the University of Miami. He is on the board of North West Company and has served with various organizations within the U.S. Naval Reserve.

**Defendant John H. Tyson**

34.    Defendant John H. Tyson ("J. Tyson") has served as a director since 1984 and has served as Chairman of the Board since 1998. Previously, Defendant J. Tyson served as CEO of Tyson from 2000 until 2006. According to the 2020 Proxy Statement, as of December 14, 2020,

---

[2] https://www.tysonfoods.com/who-we-are/our-people/leadership/stewart-f-glendinning. Last visited February 10, 2021.

Defendant J. Tyson beneficially owned 3,646,645 shares of the Company's common stock, which represented 1.24% of the total shares of Tyson stock as of that date. Given that the price per share of the Company's common stock at the close of trading on December 14, 2020 was $69.78, Defendant J. Tyson owned over $254 million worth of Tyson stock.

35.     Defendant J. Tyson is the grandson of the founder of the Company, has been part of the Company since he was a teenager, and has worked in almost every department. Defendant J. Tyson also has a substantial personal and financial interest in the Company through his association with the Tyson Limited Partnership, the Company's controlling shareholder, and his individual shareholding interests.

36.     For the 2020 Fiscal Year, Defendant J. Tyson received $11,219,289 in compensation from the Company. This included $1,229,769 in salary, $5,053,240 in stock awards, $1,500,003 in option awards, $1,761,792 in non-equity incentive plan compensation, and $1,674,485 in all other compensation.

37.     The Company's 2020 Proxy Statement stated the following about Defendant J. Tyson:

> John H. Tyson, 67, is Chairman of the Board. Mr. Tyson has been a member of the Board since 1984, has served as Chairman since 1998, and served as Chief Executive Officer from 2000 until 2006. Mr. Tyson has devoted his professional career to the Company and brings extensive understanding of the Company, its operations and the protein and food processing industries to the Board. Through his leadership experience gained as Chief Executive Officer, Mr. Tyson provides the Board with critical insight into the Company's business. In addition, Mr. Tyson, through his association with the Tyson Limited Partnership and his individual shareholding interests, has a substantial personal interest in the Company. The Board believes that Mr. Tyson's leadership experience and knowledge of the Company acquired through his years of service to the Company and his personal stake in its success qualify him to serve on the Board.

**Defendant Baledge**

38.     Defendant Les R. Baledge ("Baledge") has served as a director since February 2020. According to the 2020 Proxy Statement, as of December 14, 2020, Defendant Baledge beneficially owned 24,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on December 14, 2020 was $69.78, Defendant Baledge owned approximately $1.7 million worth of Tyson stock.

39.     For the 2020 Fiscal Year, Defendant Baledge received $238,750 in compensation from the Company. This included $78,750 in salary and $160,000 in stock awards.

40.     The Company's 2020 Proxy Statement stated the following about Defendant Baledge:

> Les R. Baledge, 63, a private investor, was executive vice president and general counsel of the Company from 1999 to his retirement in 2004. Prior to joining the Company, Mr. Baledge practiced corporate and finance law with Kutak Rock LLP and Rose Law Firm, both located in Little Rock, Arkansas. In addition, he previously served on the boards of BMP Sunstone Corp. and Fairfield Communities, Inc. Mr. Baledge has been a member of the Board since February 2020. The Board believes that Mr. Baledge's experience as a former executive of the Company and his expertise in legal, regulatory and compliance matters qualify him to serve on the Board.

**Defendant Banister**

41.     Defendant Gaurdie E. Banister Jr. ("Banister") has served as a director since 2011. According to the 2020 Proxy Statement, as of December 14, 2020, Defendant Banister beneficially owned 29,652 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on December 14, 2020 was $69.78, Defendant Banister owned approximately $2.1 million worth of Tyson stock.

42.     For the 2020 Fiscal Year, Defendant Banister received $285,000 in compensation from the Company. This included $125,000 in salary and $160,000 in stock awards.

43.     The Company's 2020 Proxy Statement stated the following about Defendant Banister:

Gaurdie E. Banister Jr., 63, is the founder and CEO of Different Points of View, a family global executive advisory and consulting firm. The company provides advice and counsel on matters ranging from strategic planning and leadership to safety and operational excellence in diverse industries. From 2007 until 2015, Mr. Banister served as President and CEO of Aera Energy LLC, a $5 billion oil and gas venture jointly owned by Shell and ExxonMobil. Prior to joining Aera Energy, Mr. Banister held a variety of executive positions with Shell. Mr. Banister also serves on the boards of Dow Inc. and Russell Reynolds Associates. Mr. Banister served on the board of the Bristow Group from 2017 to 2019 and on the board of Marathon Oil Corporation from 2015 to 2018. Mr. Banister has been a member of the Board since 2011. The Board believes that his more than 35 years in the oil and gas industry, which included significant involvement in international business, strategic planning, and mergers and acquisitions, along with his leadership experience as a CEO of California's largest oil and gas producers, qualify him to serve on the Board.

**Defendant Beebe**

44.     Defendant Mike Beebe ("Beebe") has served as a director since 2015. According to the 2020 Proxy Statement, as of December 14, 2020, Defendant Beebe beneficially owned 8,990 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on December 14, 2020 was $69.78, Defendant Beebe owned approximately $627,322 million worth of Tyson stock.

45.     For the 2020 Fiscal Year, Defendant Beebe received $265,000 in compensation from the Company. This included $105,000 in salary and $160,000 in stock awards.

46.     The Company's 2020 Proxy Statement stated the following about Defendant Beebe:

Mike Beebe, 73, currently serves as a member of the Governors' Council of the Bipartisan Policy Center ("BPC") in Washington, D.C. Prior to joining the BPC, he served as the Governor of the State of Arkansas from 2007 to 2015. Prior to the governorship, he served as the state's Attorney General from 2003 to 2007, prior to which he served as a state senator for 20 years. Mr. Beebe also serves on the board of Home BancShares, Inc. Mr. Beebe has been a member of the Board since 2015. The Board believes that his extensive leadership experience, ability to collaborate and his long-time support and understanding of business qualify him to serve on the Board. In consideration of these qualities and Mr. Beebe's tenure on the Board, the Board waived the Retirement Age By-law and nominated him to serve on the Board for the coming year.

**Defendant Bronczek**

47.     Defendant David J. Bronczek ("Bronczek") has served as a director since May 2020. For the 2020 Fiscal Year, Defendant Bronczek received $172,500 in compensation from the Company. This included $52,500 in salary and $120,000 in stock awards.

48.     The Company's 2020 Proxy Statement stated the following about Defendant Bronczek:

> David J. Bronczek, 66, previously served as president and chief operating officer of FedEx Corporation, the global logistics and transportation company, until his retirement in 2019. He worked at FedEx for more than 40 years, starting as a courier and progressing into the company's management ranks. His roles included leading FedEx Express in Canada, Europe, the Middle East and Africa, and later serving for 17 years as president and CEO of FedEx Express. Mr. Bronczek also has experience as an independent public company director, currently serving on the board of Yellowstone Acquisition Co. since October 2020, where he is the chair of its compensation committee and a member of its audit committee, and previously served on the board of International Paper from 2006 to 2019. Mr. Bronczek has been a member of the Board since May 2020. The Board believes that his extensive experience managing the logistical operations of a large, global company qualify him to serve on the Board.

**Defendant Durham**

49.     Defendant Mikel A. Durham ("Durham") has served as a director since 2015. According to the 2020 Proxy Statement, as of December 14, 2020, Defendant Durham beneficially owned 5,169 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on December 14, 2020 was $69.78, Defendant Durham owned approximately $360,693 worth of Tyson stock.

50.     For the 2020 Fiscal Year, Defendant Durham received $285,000 in compensation from the Company. This included $125,000 in salary and $160,000 in stock awards.

51.     The Company's 2020 Proxy Statement stated the following about Defendant Durham:

Mikel A. Durham, 57, is Chief Executive Officer of American Seafoods Group, a private company that harvests and markets a diverse array of seafood products and develops innovative new products for human and animal nutrition and cosmetic and other industrial applications, having served in that capacity since 2017. She previously served as the Chief Commercial Officer of CSM Bakery Solutions LLC ("CSM"), a global bakery supply manufacturer from 2014 to 2016. Ms. Durham has been a member of the Board since 2015. The Board believes her background in branded consumer packaged goods, deep understanding of the foodservice industry and experience leading international growth strategies qualify her to serve on the Board.

### Defendant Mariner

52.   Defendant Jonathan D. Mariner ("Mariner") has served as a director since 2019. For the 2020 Fiscal Year, Defendant Mariner received $285,000 in compensation from the Company. This included $125,000 in salary and $160,000 in stock awards.

53.   The Company's 2020 Proxy Statement stated the following about Defendant Mariner:

Jonathan D. Mariner, 66, has been the Chief Administrative Officer of Enjoy Technologies, a private startup based in Menlo Park, California, since December 1, 2020, and is the founder and president of Tax Day, LLC, a private software firm. Mr. Mariner previously served, on an interim basis in 2019, as the Head of Regional Sports Networks for the Walt Disney Company. In addition, he served as chief investment officer for Major League Baseball from 2015 to 2016 and as chief financial officer from 2002 to 2014, where he led the league's accounting, treasury and budgeting functions, completed more than a dozen franchise purchase and sale transactions, and helped create the league's strategic investment fund. Prior to his position at Major League Baseball, Jonathan was the CFO for the Florida Marlins Baseball Club, Florida Panthers Hockey Club and Dolphins Stadium. Mr. Mariner was elected to the board of Rocket Companies, Inc., a technology-driven real estate, mortgage and financial services business in November 2020, where he also serves as the chair of its audit committee. He also previously served as a director for Ultimate Software, a software company engaged in research, development, and delivery of human capital management technology, from 2017 to 2019, where he served as the chair of its audit committee and on the compensation committee and has also served on audit committees of private companies, including McGraw Hill Education and Little League International. He has been a member of the Board since 2019. The Board believes that Mr. Mariner's financial expertise and management experience as both a principal financial officer and director of other public and private companies qualify him to serve on the Board.

### Defendant McNamara

54.     Defendant Kevin M. McNamara ("McNamara") has served as a director since 2007. Defendant McNamara has served as Lead Independent Director since September 2019 and was appointed Vice Chairman of the Board in February 2020. According to the 2020 Proxy Statement, as of December 14, 2020, Defendant McNamara beneficially owned 30,262 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on December 14, 2020 was $69.78, Defendant McNamara owned approximately $2.1 million worth of Tyson stock.

55.     For the 2020 Fiscal Year, Defendant McNamara received $475,000 in compensation from the Company. This included $205,000 in salary and $270,000 in stock awards.

56.     The Company's 2020 Proxy Statement stated the following about Defendant McNamara:

> Kevin M. McNamara, 64, is the founding principal of McNamara Family Ventures, a family investment office providing venture and growth capital to health care companies. He is currently a director at SignifyHealth (formerly CenseoHealth), a nationwide leader in physician in-home health assessments, after having served as its Chief Executive Officer from 2015 to June 2018. Mr. McNamara also serves on the board of Luminex Corporation. Mr. McNamara has been a member of the Board since 2007, has served as Lead Independent Directors since September 2019 and was appointed Vice Chairman of the Board in February 2020. Mr. McNamara's financial expertise and professional experience are critical to the Board and its committees. His experience overseeing financial reporting processes, internal accounting and financial controls, as well as managing independent auditor engagements, qualifies him as an "audit committee financial expert" within the meaning of the regulations of the SEC. The Board believes that Mr. McNamara's financial expertise and management experience as both a principal financial officer and director of other public companies qualify him to serve on the Board.

**Defendant Miller**

57.     Defendant Cheryl S. Miller ("Miller") has served as a director since 2016. According to the 2020 Proxy Statement, as of December 14, 2020, Defendant Miller beneficially owned 4,323 shares of the Company's common stock. Given that the price per share of the

Company's common stock at the close of trading on December 14, 2020 was $69.78, Defendant Miller owned approximately $301,659 worth of Tyson stock.

58.     For the 2020 Fiscal Year, Defendant Miller received $265,000 in compensation from the Company. This included $105,000 in salary and $160,000 in stock awards.

59.     The Company's 2020 Proxy Statement stated the following about Defendant Miller:

> Cheryl S. Miller, 48, will become the Executive Vice President and Chief Financial Officer of JM Family Enterprises, a diversified automotive company, effective January 4, 2021. She previously served as President and Chief Executive Officer of AutoNation, Inc., a publicly-traded automotive retailer with major metropolitan franchises and e-commerce operations from July 2019 to April 2020, prior to which she served as Executive Vice President and Chief Financial Officer of AutoNation since 2014, and as its Treasurer and Vice President of Investor Relations since 2010. Ms. Miller also served on the Board of AutoNation, Inc. from July 2019 to July 2020. Ms. Miller has been a member of the Board since 2016. Her experience overseeing financial reporting processes, internal accounting and financial controls, as well as managing independent auditor engagements, qualifies her as an "audit committee financial expert" within the meaning of the regulations of the SEC. The Board believes that Ms. Miller's more than 20 years of corporate finance experience, financial statement expertise and deep understanding of public company shareholder matters qualify her to serve on the Board.

**Defendant Schomburger**

60.     Defendant Jeffrey K. Schomburger ("Schomburger") has served as a director since 2016. According to the 2020 Proxy Statement, as of December 14, 2020, Defendant Schomburger beneficially owned 4,994 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on December 14, 2020 was $69.78, Defendant Schomburger owned approximately $348,481 worth of Tyson stock.

61.     For the 2020 Fiscal Year, Defendant Schomburger received $265,000 in compensation from the Company. This included $105,000 in salary and $160,000 in stock awards.

62.     The Company's 2020 Proxy Statement stated the following about Defendant Schomburger:

Jeffrey K. Schomburger, 58, retired as Global Sales Officer, Customer Business Development, for The Procter & Gamble Company (P&G) in 2019, a position he held since 2015. He previously held numerous leadership positions with P&G since joining the company in 1984, including President of P&G's global Walmart team from 2005 to 2015. Mr. Schomburger has been a member of the Board since 2016. The Board believes that Mr. Schomburger's deep understanding of the branded consumer packaged goods business and his extensive management experience qualify him to serve on the Board.

**Defendant Thurber**

63.     Defendant Robert Thurber ("Thurber") has served as a director since 2009. According to the 2020 Proxy Statement, as of December 14, 2020, Defendant Thurber beneficially owned 13,926 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on December 14, 2020 was $69.78, Defendant Thurber owned approximately $971,756 worth of Tyson stock.

64.     For the 2020 Fiscal Year, Defendant Thurber received $286,756 in compensation from the Company. This included $125,000 in salary, $160,000 in stock awards, and $1,756 in all other compensation.

65.     The Company's 2020 Proxy Statement stated the following about Defendant Thurber:

Robert Thurber, 73, currently retired, served as Vice President of purchasing for Sysco Corporation, which markets and distributes food products to restaurants, healthcare and educational facilities, hotels and inns, and other foodservice and hospitality businesses from 1987 to 2007. Mr. Thurber currently serves as a director of Church Brothers, LLC, a grower, processor, and shipper of fresh vegetables located in Salinas, California. Mr. Thurber served as director of Capstone Bancshares, Inc. until 2015. Mr. Thurber has been a member of the Board since 2009. Mr. Thurber's experience at a leading marketer and distributor of food products to the foodservice industry is particularly relevant given the Company's position as a leading supplier of high quality protein and other food products to the foodservice industry. The Board benefits greatly from Mr. Thurber's extensive understanding of the foodservice industry, which provides him the insight necessary to address the challenges, opportunities and operations of the Company's complex business operations. The Board believes these attributes qualify him to serve on the Board. In consideration of these qualities and Mr. Thurber's tenure on

the Board, the Board waived the Retirement Age By-law and nominated him to serve on the Board for the coming year.

**Defendant Barbara Tyson**

66.    Defendant Barbara Tyson ("B. Tyson") has served as a director since 1988. She also served as Vice President of the Company until 2002, when she retired and became a consultant to Tyson. She stopped serving as a consultant in 2011. According to the 2020 Proxy Statement, as of December 14, 2020, Defendant B. Tyson beneficially owned 202,267 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on December 14, 2020 was $69.78, Defendant B. Tyson owned approximately $14.1 million worth of Tyson stock.

67.    Defendant B. Tyson is the aunt of Defendant J. Tyson and has a substantial personal interest in the Company as the sole income beneficiary of the BT 2015 Fund, a limited partner of the Tyson Limited Partnership.

68.    For the 2020 Fiscal Year, Defendant B. Tyson received $290,100 in compensation from the Company. This included $105,000 in salary, $160,000 in stock awards, and $25,100 in all other compensation.

69.    The Company's 2020 Proxy Statement stated the following about Defendant B. Tyson:

> Barbara A. Tyson, 71, served as Vice President of the Company until 2002, when she retired and became a consultant to the Company. She ceased serving as a consultant in 2011. Ms. Tyson has been a member of the Board since 1988. Through her years of experience as both an officer and director of the Company, Ms. Tyson developed an understanding of the Company and its operations, which allows her to assist the Board in its development of the Company's long-term strategy. Ms. Tyson, as the sole income beneficiary of the BT 2015 Fund, also has a substantial personal interest in the Company. The Board believes that Ms. Tyson's management experience, understanding of the Company and personal interest in the Company's success qualify her to serve on the Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

70.     By reason of their positions as officers and/or directors of Tyson, and because of their ability to control the business and corporate affairs of Tyson, the Individual Defendants owed Tyson and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Tyson in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Tyson and its shareholders so as to benefit all shareholders equally.

71.     Each director and officer of the Company owes to Tyson and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

72.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Tyson, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

73.     To discharge their duties, the officers and directors of Tyson were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

74.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Tyson, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

75.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

76.     To discharge their duties, the officers and directors of Tyson were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Tyson were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Arkansas, and the United States, and pursuant to Tyson's own Code of Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Tyson conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Tyson and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Tyson's operations would comply with all applicable laws and Tyson's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

77.    Each of the Individual Defendants further owed to Tyson and the shareholders the duty of loyalty requiring that each favor Tyson's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

78.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Tyson and were at all times acting within the course and scope of such agency.

79.    Because of their advisory, executive, managerial, and directorial positions with Tyson, each of the Individual Defendants had access to adverse, non-public information about the Company.

80.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Tyson.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

81.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

82.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

83.    The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually

took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Tyson was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

84.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

85.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of Tyson, and was at all times acting within the course and scope of such agency.

## TYSON'S CODE OF CONDUCT

86.    The introduction to Tyson's Code of Conduct states that "Tyson expects that all team members and Directors will conduct business fairly, ethically and in compliance with all applicable policies, laws and regulations. These core values and team behaviors are the cornerstone of all Tyson interactions with customers, suppliers, communities and each other."

87.    Importantly, "[a]ll team members and members of the Board of Directors are responsible for complying with our Code, company policies and the law. We are also responsible for completing our annual compliance training curriculum and certifying that we understand and agree to follow this Code."

88.    The Code of Conduct provides five "Team Behaviors": Caring, Candor, Creativity, Collaboration, and Commitment.

89.     The Code of Conduct provides, as to "Human Rights," that:

We are committed to respecting and promoting human rights across the globe, particularly those of team members. That is why we work with business and supply chain partners who promote the following basic principles of human rights and the law: . . .

- Providing team members with a safe and healthy workplace, and protecting the environment.
- Working with governments and communities in which we operate to improve the educational, cultural, economic and social well-being of those communities.

90.     The Code of Conduct provides, as to "Conflicts of Interest," that:

You have a duty to avoid a conflict of interest or even the appearance of a conflict. A conflict of interest arises when you have a financial or personal interest, that could interfere with your obligation to act in the best interests of the Company, or when you use your position with the Company for personal gain. If we don't handle potential conflicts of interest properly, these situations can impact the decisions we make, create the appearance of a lack of fairness and integrity, and harm the Company's reputation.

91.     The Code of Conduct provides, as to "Books & Records," that:

Our business records must accurately and fairly reflect Tyson's operations and financial condition. All transactions are to be recorded and reported in accordance with generally accepted accounting principles (GAAP). All transactions must comply with our accounting policies and procedures and our established systems of internal controls. Managing our books and records properly maintains their accuracy and integrity, and promotes efficiency, cost savings, confidentiality and legal compliance. We follow all legal requirements when maintaining, retaining and destroying company records, whether paper or electronic.

*     *     *

**HELP PREVENT FRAUD**

We rely on you to prevent fraud, such as financial statement fraud, stealing or misusing company assets, embezzlement and corruption. Fraud compromises the integrity of our books and records, violates our policies, and may also violate the law. Fraud is often committed to gain something of value or to avoid negative consequences.

Examples of Fraud include:

- Misstating financial information in our books and records

- Altering manufacturing numbers to meet productivity goals
- Misrepresenting sales of products to meet sales goals or gain business
- Failing to issue purchase orders, delaying goods receipts or holding invoices to avoid being over budget
- Misuse of purchasing cards
- Misreporting time you or others worked to earn more pay or to avoid discipline for being late or absent from work
- Submitting false or inflated requests for payment related to travel and entertainment[.]

92.    In violation of Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, certain of the Individual Defendants failed to maintain the accuracy of Company records and reports and comply with laws and regulations.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

93.    Tyson is purportedly one of the world's largest food companies and a leader in protein. John W. Tyson founded the Company in 1935 and the Company has been led by three generations of the Tyson family since then.

94.    Tyson has a broad range of protein products and brands in four major business segments: beef, pork, chicken, and prepared foods. The Company has a vertically integrated chicken production process, live cattle and hog processing, and frozen and refrigerated food products.

95.     Notably, the Company had more than 139,000 employees as of October 3, 2020; 120,000 of these employees are located in the United States.

96.     The Company emphasized that it strived towards "integrity" and creating a "safe work environment" in its annual report for the 2020 Fiscal Year, filed on Form 10-K on November 16, 2020 (the "2020 10-K"):

> Through our Core Values, Tyson Foods is a company of people engaged in the production of food, seeking to pursue trust and integrity, and committed to creating value for our shareholders, our customers, our team members, and our communities. We strive to be honorable and operate with integrity, be faith-friendly and inclusive, serve as stewards of the resources entrusted to us, and provide a safe work environment.

97.     Since December 2019, the world has been engulfed in a pandemic brought on by the rapid spread of COVID-19, a disease caused by a recently discovered coronavirus. This pandemic is one of the most serious public health crises in recent history, and at the time of the filing of this action, over 107 million cases of the virus have been reported worldwide, with the death toll approaching 2.4 million.

98.     The COVID-19 pandemic has also radically altered daily life across the planet, particularly the United States, which has become the epicenter of the outbreak. Many states have taken unprecedented measures to stop the spread of the virus, including ordering all non-essential personnel to work from home, cancelling classes at public schools and universities, and banning large public gatherings.

99.     The consequences of contracting COVID-19 can range from an asymptomatic response to flu-like symptoms (including difficult breathing, fatigue, headache, new loss of taste or smell, sore throat, congestion, and nausea), to hospitalization and death.

100.    Therefore, the CDC has also recommended measures such as social distancing of at least six feet indoors and wearing an effective face mask to protect the spread of COVID-19.

101.    Meatpacking and poultry processing require employees to physically be at plant facilities—it is not a job that can be done remotely.

102.    Around March 2020, the Company started to assure investors that the Company was monitoring and responding to the COVID-19 pandemic and had even formed a COVID-19 task force. Indeed, the Company boasted that the health and safety of its "team members" was its "top priority."

### The COVID-19 Working Condition Misconduct

103.    Unfortunately, Tyson's response to the pandemic was insufficient to care for its workers and ensure production.

104.    The federal government published guidelines regarding social distancing and personal protective equipment ("PPE") on March 9, 2020. While the rest of the country was taking precautions to prevent the spread of COVID-19, Tyson did little in response to the pandemic in March and early April 2020 to protect its workers and keep plants safely operating.

105.    In March 2020, Tyson took minor superficial steps towards protecting its employees by temporarily relaxing its punitive attendance policies, paying for workers' COVID-19 tests, and taking employee temperatures (though fever is not always a symptom of the virus).[3]

106.    Indeed, Tyson did not make any serious changes until the public and media found out that COVID-19 was quickly spreading in the meatpacking industry. The Retail, Wholesale and Department Store Union ("RWDSU") wrote in an article on April 7, 2020, that it had been imploring employers like Tyson over the past month to implement measures to protect workers and secure the food supply chain. The RWDSU specifically called out Tyson, which had a facility

---

[3] *See* Alice Driver, *Arkansas poultry workers amid the coronavirus: 'We're not essential, we're expendable'*, Arkansas Times (May 11, 2020), available at https://arktimes.com/arkansas-blog/2020/05/11/arkansas-poultry-workers-amid-the-coronavirus-were-not-essential-were-expendable. Last visited February 10, 2021.

in Camilla, Georgia where the RWDSU represented 2,000 members. Two employees there had

died, and many others were sick or in quarantine. The article further explained the conditions at

the facilities, and noted other areas that were affected:

> Tyson employs a largely black workforce that commutes from Albany, Georgia and surrounding cities to the facility daily. ***Workers debone chickens elbow to elbow with no access to masks.*** They work at speeds of upwards of 80 chickens per minute, while upper management, largely white and clad in protective gear, oversees production.
>
> Sadly Camilla, Georgia, isn't the only place affected. ***Shelbyville, Tennessee; Carthage, Mississippi; and other communities across the South are suffering due to Tyson's delayed distribution of personal protective equipment (PPE) to workers and the delayed implementation of social distancing protocols, protective barriers, and staggered start times and breaks.*** Perhaps most astonishing, the company offered workers a $500 bonus, but the ***bonus is tied to attendance*** and won't be paid out until July. Workers deserve a no-strings attached bonus now and premium pay for the additional risks to their health and the health of their families as they ensure continuity of our nation's food supply for all of our families.
>
> While the company has pledged to do better, and has started this week to share PPE with workers, put up protective barriers at some facilities, and pledged to pay union workers for time in quarantine, the fact is it's too little too late. Workers are dying. This is inexcusable for America's largest meat producer, which makes $40 billion in annual revenue. Yet, Tyson is just one example of an industry that is acting too late to protect a generation of workers that is feeding America during this crisis.

(Emphasis added.)

107.    The Company took some minimal steps, but still allowed workers to wear bandanas

or sleep masks as face coverings, which are not recommended as protective devices by the CDC.

For example, at a Tyson pork plant in Iowa, local officials and workers said that some employees

were using bandanas and sleep eyewear as facial coverings, while others wore no facial coverings

at all, and there was little evidence of social distancing.[4]

---

[4] Taylor Telford and Kimberly Kindy, *As they rushed to increase the U.S. meat supply, big processors saw plants become COVID-19 hot spots*, The Washington Post (Apr. 25, 2020), https://www.washingtonpost.com/business/2020/04/25/meat-workers-safety-jbs-smithfield-tyson. Last visited February 10, 2021.

108.    However, the Company did not require masks until April 15, 2020, and never moved workers six feet apart throughout the plant or slowed down the assembly line so that employees could socially distance.[5] Tyson did not actually provide workers with masks until April 23, 2020.[6]

109.    Because Tyson provided just one mask a day, one worker reported that she had to clean and reuse her masks since they would get splattered with chicken blood.[7] The Company hung some plastic sheets between workers, but workers continued to work side by side, although the CDC has stated that plastic sheeting does not protect from COVID-19 without social distancing. Indeed, one worker explained that employees were so close that they were "stuck together."[8]

110.    Additionally, Tyson would not tell employees about known cases of COVID-19 among coworkers.[9] According to a contractor at Tyson's plant in Independence, Iowa, workers there would get in trouble for warning others about being exposed to cases of COVID-19.[10]

111.    On April 22, 2020, a worker-led organization that advocates for the rights of poultry workers in Arkansas, brought a petition to one of the Company's plants in Springdale. Almost 200 Tyson workers demanded better benefits for workers, including full paid sick leave, and greater transparency about known COVID-19 cases.[11] Tyson then announced that workers with COVID-19 would receive short-term disability wages equivalent to 90 percent of their normal pay, rather than a lower rate.

---

[5] *Id.*
[6] Magaly Licolli, *Op-ed: As Tyson Claims the Food Supply is Breaking, Its Workers Continue to Suffer*, Civil Eats (April 30, 2020), https://civileats.com/2020/04/30/as-tyson-claims-the-food-supply-is-breaking-its-workers-continue-to-suffer/. Last visited February 10, 2021.
[7] Driver, *supra*.
[8] *Id.*
[9] *Id.*
[10] Telford and Kindy, *supra*.
[11] Driver, *supra*.

112.    In the meantime, Tyson successfully lobbied the federal government and local officials to classify meat processing as "essential" under the Defense Production Act and keep its plants open.[12] On April 26, 2020, Tyson took out full-page advertisements in the *New York Times*, *Washington Post*, and *Arkansas Democrat-Gazette*, warning that "the [American] food supply chain is breaking." Defendant J. Tyson wrote:

> As pork, beef and chicken plants are being forced to close, even for short periods of time, millions of pounds of meat will disappear from the supply chain. As a result, there will be limited supply of our products available in grocery stores until we are able to reopen our facilities that are currently closed.

113.    Further, in June 2020 Tyson reinstated its pre-pandemic absentee policy that punished employees for missing work due to illness—or missing work due to fear of exposure.[13] Indeed, workers who showed up for every scheduled shift for three months would receive a $500 thank you bonus.[14]

114.    Although the Company eventually created outdoor break room spaces to purportedly combat overcrowding, employees were still restricted from using the bathroom due to space limitations.[15]

**<u>Resulting Wrongful Death, COVID-19 Related Litigation, and Government Scrutiny</u>**

115.    Tyson's poor COVID-19 response took a grave toll on human life. In May 2020, the family of a meat cutter who died of COVID-19 filed a wrongful death lawsuit against Tyson, claiming that the Company had failed to provide the employee with protective equipment.[16] Also in May 2020, the family of a Tyson employee at a Texas facility filed a wrongful death lawsuit

---

[12] H. Claire Brown, *Families of three workers who died of Covid-19 sue Tyson for allegedly lying about outbreak*, The Counter (June 29, 2020), https://thecounter.org/tyson-meatpacking-workers-covid-19-lawsuit-waterloo/.

[13] Deena Shanker and Jen Skerritt, *Tyson reinstates policy that penalizes absentee workers*, Bloomberg (June 3, 2020), https://www.detroitnews.com/story/business/2020/06/03/tyson-reinstates-policy-penalizes-absentee-workers/111902502/.

[14] Brown, *supra*.

[15] Licolli, *supra*.

[16] *Le et al v. Tyson Foods Inc.*, 2:20-cv-00131 (May 21, 2020).

against Tyson, claiming that it had failed to provide a safe work environment during the pandemic.[17] The lawsuit specifically alleged that Tyson failed to maintain social distancing between workers, provide protective gear, tell sick workers to stay home, take workers' temperatures, or shut down the plant for a limited time.

116.    In June 2020, the families of three workers at the Waterloo, Iowa pork processing facility (the Company's largest pork plant, which was linked to over a thousand cases of COVID-19) who died of COVID-19, filed a wrongful death lawsuit claiming that managers lied to employees about the spread of COVID-19 at the plant, that Tyson failed to institute adequate safety measures, and that supervisors allowed or encouraged sick or symptomatic workers to keep working (the "Waterloo Lawsuit").[18] The Waterloo Lawsuit names Defendants Tyson, J. Tyson, White, and Banks as defendants, and alleges that Tyson officials knew COVID-19 was spreading at Waterloo plant by late March or early April of 2020, but did not tell employees and the public.

117.    The Waterloo Lawsuit further alleges that, "[o]n or about April 20, 2020, Governor [Kim] Reynolds held a conference call with the CEO of Tyson Foods, other high-ranking Tyson officials, and Tyson lobbyist Matt Eide. On information and belief, Tyson officials downplayed the seriousness of the COVID-19 outbreak at the Waterloo Facility and exaggerated the efficacy of safety measures implemented at the facility." Ex. B at 14.

118.    In September 2020, the family of an employee of Tyson Fresh Meats (a subsidiary of Tyson) in Texas brought another lawsuit alleging that the employee contracted the virus because of exposure at a Tyson plant.[19] That employee allegedly worked elbow-to-elbow with coworkers,

---

[17] *Chavez et al v. Tyson Foods, Inc.*, 9:20-cv-00134 (filed May 18, 2020 and removed to Eastern District of Texas on June 15, 2020).

[18] *Buljic et al v. Tyson Foods, Inc. et al*, 6:20-cv-02055 (removed from Black Hawk County, Case No. LA-cv-140521 on July 27, 2020 to the Northern District of Iowa). References to the "Waterloo Complaint" are to the second amended complaint filed December 9, 2020 (Doc. No. 46), attached hereto as Exhibit B ("Ex. B").

[19] *Cano et al v. Tyson Foods, Inc. et al*, 3:20-cv-00094 (filed Sept. 23, 2020, removed to Southern District of Iowa November 19, 2020).

was not provided with protective gear, and saw no efforts at social distancing. The lawsuit also alleged that appropriate cleaning was not implemented, there was no training regarding virus prevention, employees were not properly screened, production was not slowed, there was inadequate testing and contact tracing, and employees did not know that other coworkers in their proximity had tested positive. Moreover, the lawsuit alleged that Tyson flouted state and federal rules, regulations and guidance regarding the reduction and prevention of the spread of COVID-19.

119.    The Company announced on June 26, 2020 that 371 of the 1,142 employees at the plant in Noel, Missouri had tested positive for COVID-19.[20] There have been numerous other outbreaks at Tyson's many facilities.[21]

120.    In November 2020, Tyson suspended top officials at the Waterloo pork plant and launched an investigation into allegations that they bet on how many workers would get infected with COVID-19.[22] Defendant Banks said in a public statement issued by Tyson that he was "extremely upset" about the allegations and that Tyson retained the law firm Covington & Burling LLP to conduct an investigation, led by former U.S. Attorney General Eric Holder (the "Holder Investigation").[23] In December, following the investigation, Tyson fired seven managers at the Waterloo plant.

---

[20] AP News, *Tyson Foods: 371 positive COVID-19 tests at Missouri plant* (June 27, 2020), https://apnews.com/article/d3646ba688a79eba78db3bcabee80b24. Last visited February 10, 2021.

[21] Carolyn Casey, *COVID-19 Outbreaks at Tyson Foods Plants Sicken Nearly 5,000 Workers*, Expert Institute (updated on June 25, 2020), https://www.expertinstitute.com/resources/insights/covid-19-outbreaks-at-tyson-foods-plants-sicken-nearly-5000-workers/. Last visited February 10, 2021.

[22] Ryan J. Foley, *Tyson suspends Iowa plant managers amid virus betting claim*, AP News (Nov. 19, 2020), https://apnews.com/article/iowa-tyson-plant-managers-virus-bet-law-f9a4556fdd253a7ae1787039e248879a. Last visited February 10, 2021.

[23] Tyson Foods Issues Statement on Waterloo Lawsuit Allegation (Nov. 19, 2020), https://www.tysonfoods.com/news/news-releases/2020/11/tyson-foods-issues-statement-waterloo-lawsuit-allegations. Last visited February 10, 2021.

121.    Ultimately, as of December 2020, Tyson had more than three times as many COVID-19 cases as the next company—the highest number of COVID-19 cases in the meatpacking industry—and twice as many COVID-19 deaths as any other meatpacking company.[24]

**Plant Closures**

122.    The Company's careless response also led to disruptions to production, including plant closures.

123.    In a letter to Tyson dated April 17, 2020, local Iowa officials warned Tyson that the "outbreak at a facility of your size puts great risk to the safety and well-being [of] all residents in our community, especially the elderly and vulnerable." Tyson's Waterloo, Iowa pork plant was closed from April 22, 2020 to May 6, 2020 after over 180 infections were linked to the plant, and a pork plant in Logansport, Indiana was closed. Local Black Hawk County Sheriff Tony Thompson, who had visited the Waterloo plant, stated:

> We walked into that plant and some people are wearing homemade masks, some people are wearing bandannas, and some people aren't wearing anything . . . They're working elbow-to-elbow. Some are reaching over the top of others on the food production lines. They deep clean once a night. They felt like they were doing a good job, and we walked out of there thinking, "Oh my goodness, if this is the bare minimum, this isn't enough."

124.    On April 23, 2020, Tyson closed a beef facility in Pasco, Washington, indefinitely, for workers to undergo COVID-19 testing.[25]

---

[24] Food and Environment Reporting Network, *Mapping Covid-19 outbreaks in the food system*, https://thefern.org/2020/04/mapping-covid-19-in-meat-and-food-processing-plants/. Last visited February 9, 2020.

[25] Marisa Fernandez, *Tyson Foods closes another meat plant indefinitely due to coronavirus*, Axios (April 23, 2020), https://www.axios.com/tyson-foods-plant-coronavirus-5890f52c-cd31-497e-a859-d2a0b59d0c31.html. Last visited February 10, 2021.

125.    Tyson closed its Storm Lake, Iowa plant in late May 2020, because over 20% of the workers there tested positive for COVID-19.[26] Tyson resumed limited production at that facility on June 3, 2020, but also confirmed that 224 of its 1,483 employees at its Council Bluffs, Iowa plant had tested positive for COVID-19.[27] In Wilkesboro, North Carolina in early May 2020, production was suspended for two days at one of two plants for deep cleaning and sanitizing, but, county officials said that a majority of the county's COVID-19 case were linked to an outbreak at Tyson.[28]

126.    In June 2020, China stopped importing from a Tyson chicken plant in Springdale, Arkansas because of outbreaks of COVID-19.[29]

**<u>Government Reaction to Tyson's Response to COVID-19</u>**

127.    President Biden, who the Associated Press named the winner of the 2020 presidential election on November 7, 2020 has made responding to COVID-19 a top priority and would likely enforce stricter laws than the previous administration. The "Biden Plan to Combat Coronavirus (Covid-19) and Prepare for Future Global Health Threats," stated that the administration plans to:

> Direct the Occupational Safety and Health Administration (OSHA) to keep frontline workers safe by issuing an Emergency Temporary Standard that requires health care facilities to implement comprehensive infectious disease exposure control plans; ***increasing the number of OSHA investigators to improve oversight***; and working closely with state occupational safety and health agencies and state

---

[26] Olivia Rosane, *Tyson Pork Plant Closes After More Than 20% of Workers Test Positive for COVID-19*, EcoWatch (May 29, 2020), https://www.ecowatch.com/tyson-pork-plant-closes-coronavirus-2646123888.html?rebelltitem=2#rebelltitem2. Last visited February 10, 2021.

[27] Shanker and Skerritt, *supra*.

[28] Virginia Bridges, *Tyson Foods closes Wilkes County plant for deep cleaning amid coronavirus outbreak*, The News & Observer (May 9, 2020), https://www.newsobserver.com/news/coronavirus/article242625836.html. Last visited February 10, 2021.

[29] Arkansas Democrat-Gazette, State plant's poultry halted by China (Sept. 17, 2020), available at https://www.arkansasonline.com/news/2020/sep/17/state-plants-poultry-halted-by-china/. Last visited February 10, 2021.

and local governments, and the unions that represent their employees, to ensure comprehensive protections for frontline workers.

(Emphasis added.)

128.    Indeed, President Biden himself specifically called out the meatpacking industry, stating at a town hall on May 19, 2020, that:

> Whether it's cattle, whether it's beef, whether it's pigs, whether it's chicken, they're moving down that line faster and faster and faster to increase the profit rate. People are getting sicker. People are getting hurt. The very thing we should be doing now is making sure these people are protected. That they have space 6 feet apart, that they have shields around them, slow the process up. Make sure they have the protective gear, make sure they are being taken care of.

129.    President Biden emphasized that "no worker's life is worth me getting a cheaper hamburger. No workers life is worth that. That's what the hell's happened here."

130.    On June 22, 2020, Senators Elizabeth Warren and Cory Booker sent a letter to Defendant White and other meatpacking executives, questioning "how seriously Tyson takes its 'responsibility to feed our country,'" since Tyson had exported more pork to China in April 2020 than in any month since January 2017—the same month Defendant J. Tyson warned in several full-page advertisements that the American "food supply chain is breaking."

131.    The SEC also increased its scrutiny of statements related to the pandemic. On December 4, 2020, in an announcement making the first charges for misleading disclosures about the impact of the COVID-19 pandemic on its business operations and financial condition that, Stephanie Avakian, Director of the Division of Enforcement, stated: "The Enforcement Division, including the Coronavirus Steering Committee, will continue to scrutinize COVID-related disclosures to ensure that investors receive accurate, timely information, while also giving appropriate credit for prompt and substantial cooperation in investigations."[30]

---

[30] SEC Charges The Cheesecake Factory For Misleading COVID-19 Disclosures (Dec. 4, 2020), https://www.sec.gov/news/press-release/2020-306. Last visited February 10, 2021.

**The Individual Defendants' Duty to Disclose**

132.     SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies, such as Tyson, with respect to their finances and operations. Specifically, Item 303 of Regulation S-K requires that all Form 10-Qs and 10-Ks filed with the SEC include a "Management's discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") section. Item 303(a)(3) provides that the MD&A section must:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

133.     As such, the Individual Defendants had a duty under Item 303 of Regulation S-K to disclose the COVID-19 Working Condition Misconduct and its consequences, because it constituted (i) unusual transactions or significant economic changes materially affecting the Company's reporting income, and (ii) known trends or uncertainties that have had or should be reasonably expected to have a material impact on the Company's revenue or income.

**False and Misleading Statements During the Relevant Period**

***March 13, 2020 Form 8-K***

134.     On March 13, 2020, the Company filed a current report on Form 8-K (the "March 13, 2020 8-K"). The March 13, 2020 8-K supplemented the risk factors disclosed in its annual

report filed for the year ended September 28, 2019, adding the "rapidly evolving coronavirus (COVID-19) outbreak" as another risk factor.

135.    The March 13, 2020 8-K warned vaguely that the COVID-19 pandemic could disrupt its business, noting that "workers may be prohibited or otherwise unable to report to work." The Company stated, in relevant part:

> ***Pandemics or disease outbreaks, such as the novel coronavirus (COVID-19 virus), may disrupt consumption and trade patterns, supply chains, and production processes, which could materially affect our operations and results of operations.***
>
> Pandemics or disease outbreaks such as the novel coronavirus (COVID-19 virus) may depress demand for protein because quarantines may inhibit consumption.
>
> The spread of pandemics or disease outbreaks such as the COVID-19 virus may also disrupt logistics necessary to import, export, and deliver products to us or our customers. Ports and other channels of entry may be closed or operate at only a portion of capacity, as workers may be prohibited or otherwise unable to report to work, and means of transporting products within regions or countries may be limited for the same reason.
>
> Our operations, or those of independent contract poultry producers and producers who provide the live animals to our production operations, may become limited in their ability to procure, deliver, or produce our food products because of transport restrictions related to quarantines or travel bans.
>
> Workforce limitations and travel restrictions resulting from pandemics or disease outbreaks and related government actions may impact many aspects of our business. If a significant percentage of our workforce is unable to work, including because of illness or travel or government restrictions in connection with pandemics or disease outbreaks, our operations may be negatively impacted. In addition, pandemics or disease outbreaks could result in a widespread health crisis that could adversely affect the economies and financial markets of many countries, resulting in an economic downturn that could affect customers' demand for our products.

***May 4, 2020 10-Q***

136.    On May 4, 2020, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 28, 2020 (the "2Q20 10-Q"), signed by Defendant Glendinning. Attached to the 2Q20 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange

Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Glendinning and White, attesting to the accuracy of the 2Q20 10-Q.

137.    The 2Q20 10-Q assured investors that Tyson was monitoring the pandemic and created a task force to protect workers and keep plants open. The 2Q20 10-Q specifically stated in relevant part:

> COVID-19 – We are monitoring and responding to the evolving nature of the global novel coronavirus pandemic ("COVID-19" or "pandemic") and its impact to our global business. ***We formed an internal COVID-19 task force for the primary purposes of maintaining the health and safety of our team members, ensuring our ability to operate our processing facilities and maintaining the liquidity of our business.***

(Emphasis added.)

138.    The Company further touted that its "team members" were the Company's "top priority," and that Tyson had implemented CDC-recommended safety measures:

> Team Members – ***The health and safety of our team members is our top priority.*** To protect our team members, we implement safety measures recommended by the Centers for Disease Control and Prevention ("CDC") and the Occupational Safety and Health Administration ("OSHA") in our facilities and coordinate with other health officials as appropriate, including, but not limited to, checking the temperature of team members as they enter company facilities, restricting visitor access, increasing efforts to deep clean and sanitize facilities, ***requiring the use of protective face coverings and making protective face coverings and other protective equipment available to team members, and encouraging team members who feel sick to stay at home through relaxed attendance policies and enhanced benefits.*** We continue to explore and implement additional ways to ***promote social distancing in our production facilities*** by creating additional breakroom space and allowing extra time between shifts to reduce interaction of team members, as well as erecting dividers between workstations or increasing the space between workers on the production floor.

(Emphasis added.)

***August 3, 2020 10-Q***

139.    On August 3, 2020, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 27, 2020 (the "3Q20 10-Q"), signed by Defendant Glendinning and non-

party Phillip W. Thomas. Attached to the 3Q20 10-Q were certifications pursuant to SOX signed

by Defendants White and Glendinning, attesting to the accuracy of the 3Q20 10-Q.

140.    The 3Q20 10-Q specifically stated in relevant part:

COVID-19
We continue to monitor and respond to the evolving nature of the global novel coronavirus pandemic ("COVID-19" or "pandemic") and its impact to our global business. ***We formed an internal COVID-19 task force for the primary purposes of maintaining the health and safety of our team members, ensuring our ability to operate our processing facilities and maintaining the liquidity of our business.***

(Emphasis added.)

141.    The Company repeated that its "team members" were the Company's "top priority"

and that Tyson had implemented appropriate safety measures:

Team Members – ***The health and safety of our team members is our top priority.*** To protect our team members, we implement safety measures recommended by the Centers for Disease Control and Prevention ("CDC") and the Occupational Safety and Health Administration ("OSHA") in our facilities and coordinate with other health officials as appropriate, including, but not limited to, checking the temperature of team members as they enter company facilities, restricting visitor access, increasing efforts to deep clean and sanitize facilities, ***requiring the use of protective face coverings and making protective face coverings and other protective equipment available to team members, and encouraging team members who feel sick to stay at home through relaxed attendance policies and enhanced benefits.*** We implemented additional ways to ***promote social distancing in our production facilities*** by creating additional breakroom space and allowing extra time between shifts to reduce interaction of team members, as well as erecting dividers between workstations or increasing the space between workers on the production floor.

(Emphasis added.)

***November 16, 2020 10-K***

142.    On November 16, 2020, the Company filed the 2020 10-K. Attached to the 2020

10-K were certifications pursuant to SOX signed by Defendants Banks and Glendinning, attesting

to the accuracy of the 2020 10-K.

143.    Regarding its "Employees and Labor Relations," the 2020 10-K assured investors

that it had implemented safety measures in response to the pandemic. The 2020 10-K stated, in

relevant part:

> **Health and Safety:** We maintain a safety culture grounded on the premise of
> eliminating workplace incidents, risks and hazards. We have created and
> implemented processes to help eliminate safety events by reducing their frequency
> and severity. We also review and monitor our performance closely. Our goal is to
> reduce Occupational Safety and Health Administration ("OSHA") recordable
> incidents by 10% year over year. During fiscal 2020, our recordable incident rate
> declined 17% compared to fiscal 2019. ***In response to the global novel coronavirus
> pandemic ("COVID-19" or "pandemic"), we have implemented and continue to
> implement safety measures in all our facilities.*** As an expansion of our We Care
> workplace safety program and continued efforts to boost the overall health and
> wellness of our workforce, we are piloting health clinics near our production
> facilities, giving team members and their families easier access to high-quality
> healthcare.

(Emphasis added.)

144.    The 2020 10-K also explained that it was still monitoring the pandemic and had

formed a task force to maintain health and safety, and thus operations and liquidity. The 2020 10-

K stated, in relevant part:

> COVID-19
> We continue to monitor and respond to the evolving nature of COVID-19 and its
> impact to our global business. We formed an internal COVID-19 task force for the
> primary purposes of maintaining the health and safety of our team members,
> ensuring our ability to operate our processing facilities and maintaining the liquidity
> of our business.

145.    The 2020 10-K again emphasized the importance of the health and safety of its

team. The 2020 10-K stated, in relevant part:

> Team Members – ***The health and safety of our team members is our top priority.***
> To protect our team members, we have implemented and will continue to
> implement safety measures recommended by the Centers for Disease Control and
> Prevention ("CDC") and the Occupational Safety and Health Administration
> ("OSHA") in our facilities and coordinate with other health officials as appropriate,
> including, but not limited to, checking the temperature of team members as they
> enter company facilities, restricting visitor access, increasing efforts to deep clean
> and sanitize facilities, ***requiring the use of protective face coverings and making
> protective face coverings and other protective equipment available to team
> members and encouraging team members who feel sick to stay at home through***

*relaxed attendance policies and enhanced benefits.* We implemented additional ways to *promote social distancing in our production facilities* by creating additional breakroom space and allowing extra time between shifts to reduce interaction of team members, as well as erecting dividers between workstations or increasing the space between workers on the production floor.

146.    The 2020 10-K also stated the following regarding social distancing and other government directives:

Governmental authorities at the federal, state and local levels may increase or impose new or stricter social distancing directives, stay-at-home restrictions, travel bans, quarantines, workforce and workplace restrictions or other measures related to COVID-19. Such actions could cause us to continue to incur additional costs.

(Emphasis added.)

147.    The statements referenced above in ¶¶134-146 were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, finances, and prospects, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Tyson was engaging in the COVID-19 Working Condition Misconduct, exposing its workers and surrounding communities to the spread of COIVD-19; (2) the Company knew or should have known that COVID-19 was rapidly spreading across the globe; (3) consequently, Tyson's production suffered, resulting in financial harm to the Company; (4) the Company was exposed to an increased risk for litigation and regulatory scrutiny; and (5) the Company failed to maintain internal controls. As a result of the foregoing, Tyson's public statements were materially false and misleading during the Relevant Period.

**The Truth Emerges**

148.    On December 15, 2020, Comptroller Stringer wrote a letter to the SEC, urging the SEC to investigate Tyson. Comptroller Stringer pointed out that there was "urgency to this

request," because the Company's annual meeting was approaching on February 11, 2021, for which the Company would file definitive proxy materials for shareholder review. In the letter, he pointed out statements that Tyson made in filings that are materially false or materially misleading.

149.    Comptroller Stringer described Tyson's ineffective efforts—and lack thereof—to protect its employees from coronavirus. For example, Comptroller Stringer wrote, in relevant part:

> Unfortunately, the steps Tyson eventually took to protect employees were grudging and minimal, such as letting workers use bandanas or sleep masks, which function poorly as protective devices. Tyson never moved workers six feet apart throughout the plant, nor did it slow the assembly line so that workers could be socially distanced. The Company did hang plastic sheeting between workers as they continued to work elbow to elbow, even though the Centers for Disease Control and Prevention ("CDC") told the industry that plastic sheeting does not work unless workers are at least six feet apart.

Ex. A at 5.

150.    Comptroller Stringer also explained that employees were misled to believe that coronavirus was not causing any issues, although it was causing sickness, death, and plant closures:

> As COVID-19 was infecting its employees, Tyson reportedly misled its workforce in its largest pork plant by telling them that "everything is fine." Eventually over 1000 workers in that plant tested positive, leading to worker deaths, hospitalizations, and plant closure.

*Id.*

151.    Comptroller Stringer also described Tyson's ineffective sick leave policy, among others. The letter stated, in relevant part:

> Tyson's sick leave policy was similarly limited. As COVID-19 swept through its plants, in a nod to the CDC guidance that sick workers must stay home, Tyson paused its policy of penalizing workers who called in sick for a few months. However, it appears that Tyson then proceeded to undermine that policy. In April, employees were incentivized to continue working via a $500 "thank you" bonus promised to workers who showed up for every scheduled shift over a three month period. Then in June, Tyson reinstated its policy penalizing workers who take sick leave to avoid contact with any exposed workers.

> Other steps were similarly limited. Tyson only reluctantly built some outdoor break rooms in a few plants to prevent workers from crowding into break rooms. Workers

had to continue crowding into bathrooms, and many never got time to even visit a bathroom once a day.

*Id.* at 5-6.

152.    The letter also explained the consequences of these ineffective and non-existent

safety measures, stating, in relevant part:

> Tyson's tardy and limited reaction took a serious human toll. A report by the non-profit Food Environment Reporting Network has tracked COVID-19 outbreak in the meatpacking industry (as well as the food processing and farm sectors) and reports that as of December 3, 2020 Tyson has the highest number of COVID-19 cases of any company in the meatpacking industry, more than three times as many cases as the next company (11,087 vs. 3,026 cases at JBS, the nation's largest meatpacking company). Tyson reported twice as many deaths as any other meatpacking company. Recent research data demonstrate that Tyson and other companies in the meatpacking industry are uniquely vulnerable to COVID-19 outbreaks. A November 2020 article published under the aegis of the National Academy of Sciences estimated that livestock plants were associated with 236,000 to 310,000 COVID-19 cases (6 to 8% of total) and 4,300 to 5,200 deaths (3 to 4% of total) as of July 21, 2020.

*Id.* at 6.

153.    On this news, the price of the Company's stock dropped from $69.78 per share at

the close of trading on December 14, 2020, to $68.25 per share at the close of trading on December

15, 2020.

## DAMAGES TO TYSON

154.    As a direct and proximate result of the Individual Defendants' conduct, Tyson will

lose and expend many millions of dollars.

155.    Such expenditures include, but are not limited to, legal fees and payments

associated with the numerous lawsuits and other actions lodged against the Company as a result

of the misconduct discussed herein including the wrongful death actions discussed above, the

Holder Investigation, inquiries by Senators Warren and Booker, the Securities Class Action,

possible investigation by the SEC, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

156.    Additionally, these losses include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

157.    As a direct and proximate result of the Individual Defendants' conduct, Tyson has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

158.    Plaintiff brings this action derivatively and for the benefit of Tyson to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Tyson, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act, as well as the aiding and abetting thereof.

159.    Tyson is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

160.    Plaintiff is, and has been at all relevant times, a shareholder of Tyson. Plaintiff will adequately and fairly represent the interests of Tyson in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

161.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

162.    A pre-suit demand on the Board of Tyson is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following 14 individuals: Defendants White, Banks, J. Tyson, B. Tyson, Baledge, Banister, Beebe, Bronczek, Durham, Mariner, McNamara, Miller, Schomburger, and Thurber (the "Directors"). Plaintiff needs only to allege demand futility as to seven of the 14 Directors who are on the Board at the time this action is commenced.

163.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to participate in the COVID-10 Working Condition Misconduct and to make and/or cause the Company to make the false and misleading statements and omissions of material fact, which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

164.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly caused the Company to participate in the COVID-19 Working Condition Misconduct and made and/or caused the Company to make the materially false and misleading statements alleged herein.

165.    As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

166.   Additional reasons that demand on Defendant White is futile follow. Defendant White served as the Company's CEO during the Relevant Period and currently serves as the Executive Vice Chairman of the Board. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant White with his principal occupation, and he receives handsome compensation, including $10,993,649 in 2020 for his services. Defendant White was ultimately responsible for most of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made or signed off on, including the 2020 10-K and 2Q20 10-Q. As the Company's highest officer prior to and for a portion of the Relevant Period and as a trusted Company director, he conducted little, if any, oversight of the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant White is a defendant in the Securities Class Action. For these reasons, Defendant White breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167.   Additional reasons that demand on Defendant Banks is futile follow. Since October 2020, Defendant Banks has served as the President and CEO of the Company. He also has served as a Company director since 2017. Thus, as the Company admits, he is a non-independent director. Defendant Banks has received and continues to receive compensation for his role as described above. As the Company's highest officer since October 2020, and as a trusted Company director, he conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, consciously

disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Banks signed, and thus personally made the false and misleading statements in the Company's 2020 10-K. Moreover, Defendant Banks is a defendant in the Securities Class Action. For these reasons, Defendant Banks breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168.    Additional reasons that demand on Defendant J. Tyson is futile follow. Defendant Tyson currently serves as the Company's Chairman and has been a Company director since 1984. Defendant J. Tyson is the grandson of the founder of the Company, has been part of the Company since he was a teenager, and has worked in almost every department. Defendant J. Tyson also has a substantial personal and financial interest in the Company through his association with the Tyson Limited Partnership, the Company's controlling shareholder, and his individual shareholding interests. Defendant J. Tyson also helped to develop the Company's "Core Values." Thus, as the Company admits, he is a non-independent director.

169.    The Company provides Defendant J. Tyson with his principal occupation, and he receives handsome compensation, including $11,219,289 in fiscal year 2020 for his services. Furthermore, Defendant J. Tyson signed, and thus personally made the false and misleading statements in the 2020 10-K. He also authored the advertisements in major newspapers warning of risks to the American food supply amidst the pandemic. As a trusted Company director, he conducted little, if any, oversight of the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant J. Tyson breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170.    Additional reasons that demand on Defendant B. Tyson is futile follow. Defendant B. Tyson has served as a Company director since 1988, and became a consultant to the Company in 2002, after she retired as a vice president. Defendant B. Tyson is the aunt of Defendant J. Tyson. Defendant B. Tyson also has a substantial personal interest in the Company as the sole income beneficiary of the BT 2015 Fund, a limited partner of the Tyson Limited Partnership. Defendant B. Tyson has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant B. Tyson signed, and thus personally made the false and misleading statements in the 2020 10-K. For these reasons, Defendant B. Tyson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

171.    Additional reasons that demand on Defendant Baledge is futile follow. Defendant Baledge has served as a Company director since 2020. Defendant Baledge has received and continues to receive compensation for his roles with the Company as described above. As a trusted Company officer and director, he conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.

Furthermore, Defendant Baledge signed, and thus personally made the false and misleading statements in the 2020 10-K. For these reasons, Defendant Baledge breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172.    Additional reasons that demand on Defendant Banister is futile follow. Defendant Banister has served as a Company director since 2011. Defendant Banister has received and continues to receive compensation for his roles with the Company as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Banister signed, and thus personally made the false and misleading statements in the 2020 10-K. For these reasons, Defendant Banister breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.    Additional reasons that demand on Defendant Beebe is futile follow. Defendant Beebe has served as a Company director since 2015. Defendant Beebe has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Beebe signed, and thus personally made the false and misleading statements in the 2020

10-K. For these reasons, Defendant Beebe breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant Bronczek is futile follow. Defendant Bronczek has served as a Company director since 2020. Defendant Bronczek has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Bronczek breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175.    Additional reasons that demand on Defendant Durham is futile follow. Defendant Durham has served as a Company director since 2015. Defendant Durham has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Durham signed, and thus personally made the false and misleading statements in the 2020 10-K. For these reasons, Defendant Durham breached her fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Mariner is futile follow. Defendant Mariner has served as a Company director since 2019. Defendant Mariner has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Mariner signed, and thus personally made the false and misleading statements in the 2020 10-K. For these reasons, Defendant Mariner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177.    Additional reasons that demand on Defendant McNamara is futile follow. Defendant McNamara has served as a Company director since 2007. Defendant McNamara has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McNamara signed, and thus personally made the false and misleading statements in the 2020 10-K. For these reasons, Defendant McNamara breached his fiduciary

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178.    Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since 2016. Defendant Miller has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Miller breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

179.    Additional reasons that demand on Defendant Schomburger is futile follow. Defendant Schomburger has served as a Company director since 2016. Defendant Schomburger has received and continues to receive compensation for his roles with the Company as described above. As a trusted Company officer and director, he conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Schomburger signed, and thus personally made the false and misleading statements in the 2020 10-K. For these reasons, Defendant Schomburger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

180.    Additional reasons that demand on Defendant Thurber is futile follow. Defendant Thurber has served as a Company director since 2009. Defendant Thurber has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Thurber signed, and thus personally made the false and misleading statements in the 2020 10-K. For these reasons, Defendant Thurber breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

181.    Additional reasons that demand on the Board is futile follow.

182.    Defendants Beebe, Mariner, McNamara, and Miller (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Audit Committee Charter, the Audit Committee Defendants bear responsibility for, *inter alia*, the effectiveness of the Company's internal controls, the integrity of its financial statements, and aspects of risk management and legal and regulatory compliance that may affect the Company's financial reporting. The Audit Committee Defendants failed to ensure the integrity of the Company's internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to participate in the COVID-19 Working Condition Misconduct, and to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

183.    The Directors have longstanding business and personal relationships with each other that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

184.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Directors failed to maintain the accuracy of Company records and reports and comply with laws and regulations. Thus, the Directors face a substantial likelihood of liability, and demand is futile as to them.

185.    Tyson has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Tyson any part of the damages Tyson suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

186.    The Individual Defendants' conduct described herein and summarized above, could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision

exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

187.    The acts complained of herein constitute violations of fiduciary duties owed by Tyson's officers and directors, and these acts are incapable of ratification.

188.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the shareholders of Tyson. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Tyson, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

189.    If there is no directors' and officers' liability insurance, then the Directors will not cause Tyson to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

190.   Thus, for all of the reasons set forth above, all 14 of the Directors, and if not all of them, at least seven of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants White, Banks, and Glendinning Under Sections 10(b) and 21D of the Exchange Act

191.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.   Tyson, along with Defendants White, Banks, and Glendinning are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants White, Banks, and Glendinning's willful and/or reckless violations of their obligations as officers and/or directors of Tyson.

194.   Defendants White, Banks, and Glendinning, because of their positions of control and authority as officers and/or directors of Tyson, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Tyson, including the wrongful acts complained of herein and in the Securities Class Action.

195.   Accordingly, Defendants White, Banks, and Glendinning are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange

Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

196.    As such, Tyson is entitled to receive all appropriate contribution or indemnification from Defendants White, Banks, and Glendinning.

## SECOND CLAIM

### Against the Individual Defendants for Breaches of Fiduciary Duties

197.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Tyson's business and affairs.

199.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

200.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Tyson.

201.    In breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in, the COVID-19 Working Condition Misconduct.

202.    The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

203.    In further breach of their fiduciary duties owed to Tyson, during the Relevant Period, the Individual Defendants intentionally or recklessly made and/or caused the Company to make false and misleading statements of material fact. Specifically, the Individual Defendants

made and/or caused the Company to make false and misleading statements of material fact that failed to disclose that: (1) Tyson was engaging in the COVID-19 Working Condition Misconduct, exposing its workers and surrounding communities to the spread of COIVD-19; (2) the Company knew or should have known that COVID-19 was rapidly spreading across the globe; (3) consequently, Tyson's production suffered, resulting in financial harm to the Company; (4) the Company was exposed to an increased risk for litigation and regulatory scrutiny; and (5) the Company failed to maintain internal controls. As a result of the foregoing, Tyson's public statements were materially false and misleading during the Relevant Period.

204.    The Individual Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

205.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tyson's securities and hiding the COVID-19 Working Condition Misconduct.

206.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were

not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly.

207.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

208.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Tyson has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

209.    Plaintiff, on behalf of Tyson, has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Unjust Enrichment**

210.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

211.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Tyson.

212.    The Individual Defendants either benefitted financially from the improper conduct or received profits, bonuses, stock options, or similar compensation from Tyson that was tied to the performance or artificially inflated valuation of Tyson or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

213.    Plaintiff, as a shareholder and a representative of Tyson, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from

benefits and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

214.    Plaintiff on behalf of Tyson has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

215.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Tyson, for which they are legally responsible.

217.    As a direct and proximate result of the Individual Defendants' abuse of control, Tyson has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Tyson has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

218.    Plaintiff on behalf of Tyson has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

219.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

220.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Tyson in a manner consistent with the operations of a publicly-held corporation.

221.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Tyson has sustained and will continue to sustain significant damages.

222.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

223.    Plaintiff on behalf of Tyson has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

224.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

225.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Tyson to waste valuable corporate assets and to incur many millions of dollars of legal liability and costs to investigate and defend unlawful actions.

226.    Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

227.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

228.    Plaintiff on behalf of Tyson has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Tyson, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Tyson;

(c)     Determining and awarding to Tyson the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Tyson and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Tyson and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Tyson to nominate at least seven candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Tyson restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: February 10, 2021        Respectfully submitted,

                                **THE BROWN LAW FIRM, P.C.**

                                */s/ Timothy Brown*

                                Timothy Brown
                                240 Townsend Square
                                Oyster Bay, New York 11771
                                Telephone: (516) 922-5427
                                Facsimile: (516) 344-6204
                                Email: tbrown@thebrownlawfirm.net

                                *Counsel for Plaintiff*

## **VERIFICATION**

I, Hugues Gervat am a plaintiff the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2021.

2/10/2021

DocuSigned by:

Hugues Gervat

2F6AF3BA1A3040E...

Hugues Gervat